UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIZED ASSET FUNDING 2011-2, LTD.,<br><br>Plaintiff,<br><br>v.<br><br>CANADIAN IMPERIAL BANK OF COMMERCE,<br><br>Defendant. | Civil Action No.:<br><br><br>**COMPLAINT FOR DAMAGES** |

Plaintiff Securitized Asset Funding 2011-2, Ltd. ("SAF"), by and through its undersigned counsel, alleges for its Complaint against Defendant Canadian Imperial Bank of Commerce ("CIBC") as follows:

**NATURE OF THE CASE**

1.      This case is about two contracts between sophisticated parties represented by sophisticated counsel.  These two contracts were entered into in October 2008 and June 2011. Defendant CIBC, a commercial bank with over $400 billion in assets and a market capitalization of more than $40 billion, initiated both transactions.  CIBC was represented in these transactions by top-tier counsel who drafted both contracts.  As CIBC's counsel stated during contract negotiations, a key contract provision here "clearly outline[s] which cashflows are due from CIBC."  Pursuant to these two contracts, Plaintiff SAF and its predecessor paid $651 million to CIBC.  CIBC benefitted greatly from these payments, which helped stabilize CIBC at a critical time.  Having reaped the benefits of these payments, CIBC now refuses to make required payments to SAF pursuant to these contracts, in breach of the unambiguous contract provisions.

2.      In 2008, CIBC held billions of dollars in United States residential real estate assets that exposed it to the housing crisis.  In the first half of 2008 alone, CIBC incurred nearly $5.5 billion in losses directly attributable to its residential real estate portfolio.  At the time, Bloomberg reported that of all the Canadian banks, CIBC "suffered the most from the collapse of the U.S. mortgage market after expanding in trading of credit derivatives more rapidly than domestic rivals. ... CIBC's subprime losses account for about two-thirds of the total for Canadian banks."

3.      In an effort to reduce its exposure to the volatile United States residential real estate market in the fall of 2008, CIBC needed an investor willing to make a sizable investment in CIBC and its real estate portfolio.  In October 2008, Promontoria Europe Investments XIII LDC ("Promontoria"), a special purpose investment vehicle managed by Cerberus Capital Management L.P. ("Cerberus") and funded by private investment funds and accounts managed by Cerberus or its affiliates, provided the lifeline that CIBC sought.

4.      That lifeline came in the form of a contract, a promissory note known as the A Note (attached hereto as Exhibit A).  Pursuant to the A Note, Promontoria agreed to loan $571 million to CIBC.  In exchange for this $571 million loan, the A Note obligates CIBC to make monthly payment streams based on the performance of specifically identified assets in CIBC's United States residential real estate portfolio.  Pursuant to subsequent transactions not relevant to this lawsuit, another Cerberus affiliate, Plaintiff SAF, now holds the A Note.

5.      The A Note transaction provided enormous benefit to CIBC, which CIBC touted publicly.  During a conference call to discuss the transaction in October 2008, CIBC's then-President and Chief Executive Officer, Gerry McCaughey, hailed the transaction as "a significant step forward for CIBC" "that will significantly limit [CIBC's] future exposure to the U.S. residential real estate market."

6.     At the same time, SAF's predecessor in interest, Promontoria, took a substantial risk in entering into the A Note.  There was no assurance that the assets underlying the A Note would perform in a manner such that the A Note would be fully repaid.  Given the risk in those assets and the state of the United States economy generally and the residential real estate market in particular in October 2008, there was a serious and material risk that the $571 million loan would never be repaid in full.

7.     In 2011, CIBC requested that Cerberus enter into a follow-on transaction to the A Note.  In June 2011, CIBC and SAF entered into a second contract, known as the B Note (attached hereto as Exhibit B).  Pursuant to this contract, SAF provided CIBC an additional $80 million in exchange for the B Note.  The B Note, which contains identical payment terms as the A Note, is a certificate that entitles SAF to the residual interests in the exact same payment streams set forth in the A Note, but only if the A Note is paid off.  When SAF and CIBC entered into the B Note transaction in June 2011, the balance of the A Note exceeded $540 million, and it was unclear whether the A Note would be paid off and, therefore, whether the B Note would result in any payments to SAF.

8.     CIBC has received the full benefits of both the A Note and the B Note.  CIBC was paid more than $651 million for the A Note and the B Note, which placated investor and analyst demands that CIBC reduce its exposure to the United States residential real estate market.  Having reaped the benefits of both transactions, CIBC now seeks to avoid its obligations.

9.     Under the A Note and the B Note, CIBC is obligated to make monthly payments to SAF based on the performance of specifically identified cash assets and synthetic assets.  The monthly payment streams that CIBC must pay include (but are not limited to) two amounts defined as "Synthetic Asset Libor Amount" and "Synthetic Asset Interest Proceeds Amount." These payments are owed "for each Synthetic Asset" identified in the A Note and the B Note.

The payments due on one set of Synthetic Assets—credit default swaps between CIBC and Goldman Sachs International on notes issued by Altius IV Funding, Ltd.—has led to this dispute.

10.     The calculation of the Synthetic Asset Libor Amount ("Synthetic Libor") and the Synthetic Asset Interest Proceeds Amount ("Synthetic Interest") for the Altius IV credit default swaps is based on the Relevant Notional Amount for those swaps.  As long as there is a Relevant Notional Amount on the Altius IV credit default swaps, CIBC is obligated to pay Synthetic Libor and Synthetic Interest to SAF each month.

11.     CIBC improperly reduced the Relevant Notional Amount on the Altius IV credit default swaps to $0 following a liquidation of the assets underlying the Altius IV notes in July 2015.  There is no contractual basis to eliminate the Relevant Notional Amount following a liquidation of the assets underlying the Altius IV notes.  That is particularly true where, as here, the amount of the liquidation proceeds was far less than the Relevant Notional Amount at the time of liquidation.

12.     As a result of CIBC's improper reduction of the Relevant Notional Amount, CIBC has failed to pay the full Synthetic Libor and the full Synthetic Interest owed to SAF.  That is a breach of CIBC's obligations under the A Note and the B Note.

13.     SAF brings this action as a result of CIBC's failure to abide by the clear and unambiguous terms of the A Note and the B Note.  CIBC's breaches have caused damage to SAF of hundreds of millions of dollars.  By this Complaint, SAF seeks compensatory damages for CIBC's breaches of contract.

## THE PARTIES

14.     Plaintiff Securitized Asset Funding 2011-2, Ltd. ("SAF") is a special purpose investment vehicle affiliated with Cerberus Capital Management, L.P. ("Cerberus").  SAF is incorporated in the Cayman Islands and has its principal place of business in New York, New

York.  SAF is the holder of both the A Note and the B Note.  In 2012, SAF and certain Cerberus-affiliated investment vehicles entered into a series of transactions, the result of which is that SAF holds the A Note.  SAF was the counterparty in the B Note transaction.

15.     Defendant Canadian Imperial Bank of Commerce ("CIBC") is a Canadian bank constituted under the Bank Act (Canada).  CIBC is headquartered in Toronto, Ontario.  CIBC conducts business in the State of New York.

**JURISDICTION AND VENUE**

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as diversity of citizenship exists among the parties and the amount in controversy, exclusive of interest and costs, exceeds $75,000.

17.     CIBC has expressly consented to personal jurisdiction in this Court.  Paragraph 12(c) of both contracts at issue in this lawsuit, the A Note and the B Note, provides that "any legal action or proceeding with respect to this Note may be brought in the courts of the State of New York in the Borough of Manhattan, County of New York or of the United States District Court for the Southern District of New York, and, by issuance and acceptance of this Note, the Issuer [CIBC] and the Holder [SAF] hereby irrevocably accept, generally and unconditionally, the jurisdiction of the aforesaid courts."  *See* A Note, Annex I at ¶ 12(c); *see also* B Note, Annex I at ¶ 12(c) (similar).

18.     This Court also has personal jurisdiction over CIBC pursuant to New York's long-arm statute, C.P.L.R. § 302(a), because CIBC has minimum contacts with the state and transacts business within the state.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) because CIBC transacts business in this District, the transactions at issue took place, at least in part, in

this District, and a substantial part of the events giving rise to this Complaint occurred, at least in part, in this District.

20.     Paragraph 12(c) of the A Note and the B Note provides that both contracts "shall be governed by, and construed in accordance with, the laws of the State of New York."  *See* A Note, Annex I at ¶ 12(c); B Note, Annex I at ¶ 12(c).  Paragraph 12(c) further provides that the parties "hereby waive any right to a trial by jury in any action, proceeding or counterclaim concerning any rights under this Note … and agree that any such action, proceeding or counterclaim shall be tried before a court and not before a jury."  *See* A Note, Annex I at ¶ 12(c); *see also* B Note, Annex I at ¶ 12(c) (similar).

## FACTUAL ALLEGATIONS

### CIBC Enters Credit Default Swaps with Goldman Sachs

21.     In 2007, CIBC and Goldman Sachs International ("Goldman Sachs") entered into three credit default swaps relating to separate tranches of notes issued by Altius IV Funding, Ltd. ("Altius IV").  The Altius IV notes were directly tied to the United States residential real estate market, as the notes received payments based on the performance of an underlying portfolio of assets, including residential mortgage-backed securities.   The terms of the Altius IV credit default swaps are set forth in three confirmations between CIBC and Goldman Sachs (the "Swap Confirmations," attached hereto as Exhibit C).[1]   The Altius IV Swap Confirmations have an effective date of June 5, 2007 and a termination date of November 2, 2042.  Pursuant to these credit default swaps, Goldman Sachs purchased credit protection from CIBC covering the occurrence of a Credit Event on the underlying Altius IV notes.

22.     The Altius IV Swap Confirmations obligated Goldman Sachs, as the buyer of credit protection, to make monthly payments to CIBC.  These monthly payments were defined as

---

[1] Capitalized terms which are not defined in this Complaint have the meanings ascribed to them in the A Note, the B Note, or the Swap Confirmations.

Fixed Payments.  The amount of the monthly Fixed Payments was defined as 10.5 basis points multiplied by the Relevant Notional Amount of the Altius IV credit default swaps.  When CIBC and Goldman Sachs entered into the Altius IV Swap Confirmations, the Relevant Notional Amount of the Altius IV credit default swaps was approximately $860 million.  *See* Altius IV Swap Confirmations at 2.

23.     The Altius IV Swap Confirmations identify specific Credit Events.  *See* Altius IV Swap Confirmations at 5.  One of those Credit Events is a default in the payment of principal or interest on the Altius IV notes.  *See id.*  Upon the occurrence of a Credit Event, the Altius IV Swap Confirmations provided that there would be a Physical Settlement unless Goldman Sachs chose otherwise.  *See id.*  In a Physical Settlement, Goldman Sachs, as the buyer of credit protection, was obligated to deliver the Altius IV notes to CIBC, as the seller of credit protection.

24.     Following a Physical Settlement, CIBC would be entitled to hold the Altius IV notes and receive any monthly payments made on their account.  Alternatively, CIBC could sell the notes or liquidate the assets underlying the notes.  Regardless of what CIBC did with the Altius IV notes, the Altius IV credit default swaps with Goldman Sachs would remain in place and require the following payments between CIBC and Goldman Sachs:

- Goldman Sachs would be obligated to make Fixed Payments to CIBC, as set forth in the Altius IV Swap Confirmations, each month through the termination of the Altius IV credit default swaps in November 2042;

- CIBC would be obligated to pay interest to Goldman Sachs each month through the termination of the Altius IV credit default swaps in November 2042, based on the balance of the Altius IV notes as of the date of Physical Settlement (regardless of the amount of interest that CIBC received on account of holding those notes); and

- Upon the termination of the Altius IV credit default swaps in November 2042, CIBC was obligated to pay to Goldman Sachs the full amount of principal due on the Altius IV notes as of the date of the Physical Settlement (regardless of the amount of principal that CIBC received on account of holding those notes from the date of Physical Settlement to November 2042).

***CIBC Seeks to Address Its Exposure to the United States Housing Market Crisis***

25.     The United States housing market was in a steep decline when CIBC and Goldman Sachs entered into the Altius IV credit default swaps in 2007.   The second-largest subprime mortgage lender in the United States, New Century Financial Corporation, filed for bankruptcy in April 2007.   The largest mortgage lender in the United States, Countrywide Financial Corporation, narrowly avoided bankruptcy in August 2007 by securing an $11.5 billion emergency loan from a group of banks.   In September 2007, Merrill Lynch announced $5.5 billion in losses, later increased to $8.4 billion, stemming from investments in subprime mortgages.

26.     The collapse of the United States housing market accelerated in early 2008.  Bear Stearns, a global investment bank and securities trading and brokerage firm that invested heavily in subprime mortgages, collapsed in March 2008.   The seventh-largest mortgage lender in the United States, IndyMac Bank, was seized by the Federal Deposit Insurance Corporation ("FDIC") in July 2008, constituting the fourth-largest bank failure in United States history at the time.   In September 2008, Freddie Mac and Fannie Mae were placed into conservatorship by the United States Treasury, Washington Mutual Bank was seized by the FDIC, and Lehman Brothers Holdings collapsed in the largest bankruptcy filing in United States history.   Each of these events stemmed from the United States housing crisis.

27.     CIBC was also hit hard by the collapsing United States housing market.  In the first quarter of 2008, CIBC incurred nearly $3 billion in losses in its residential real estate portfolio, resulting in a net loss for CIBC of $1.5 billion for the quarter.   In announcing those results, CIBC's then-President and Chief Executive Officer, Gerry McCaughey, stated: "Our losses related to the U.S. residential mortgage market are a significant disappointment and are not aligned with our strategic imperative of consistent and sustainable performance."

28.     In the second quarter of 2008, CIBC incurred an additional $2.5 billion in losses relating to its residential real estate portfolio, resulting in a net loss for CIBC of more than $1 billion.  On the day that CIBC announced its second quarter loss, Bloomberg reported that of all the Canadian banks, CIBC "suffered the most from the collapse of the U.S. mortgage market after expanding in trading of credit derivatives more rapidly than domestic rivals. ...  CIBC's subprime losses account for about two-thirds of the total for Canadian banks."

29.     By the summer of 2008, CIBC needed to address its exposure to the United States housing market and assuage mounting investor and analyst concerns.  To that end, CIBC contacted Cerberus regarding a possible investment in CIBC and its residential real estate portfolio.  Upon information and belief, CIBC contacted other potential investors in addition to Cerberus.

30.     Over the next few months, CIBC and Cerberus negotiated the structure and terms of a loan by an affiliate of Cerberus in the form of a promissory note referred to as the A Note. CIBC and its counsel drafted the the principal transaction documents, including the contract between the parties, annexes and exhibits to the contract and related transaction documents.  As set forth below, the terms of the A Note were linked to the performance of assets in CIBC's United States residential real estate portfolio, including residential mortgage-backed securities, collateralized debt obligations and credit default swaps.

31.     CIBC and and the Cerberus affiliate, Promontoria, reached agreement on the terms of the A Note in early October 2008.

### CIBC Announces the Agreement to Calm Fears in the Market

32.     On October 3, 2008, CIBC publicly announced its agreement with Promontoria, touting Promontoria's commitment "to invest U.S. $1.050 billion in cash in CIBC's U.S. residential real estate portfolio" and hailing the transaction as a critical step towards "further

strengthening its balance sheet by significantly reducing its remaining exposure to the U.S. residential real estate market."

33.     CIBC held a conference call for analysts and investors on that day to further celebrate the agreement.  During the conference call, CIBC's then-President and Chief Executive Officer, Gerry McCaughey, stated that the transaction "will further CIBC's capital strength by reducing contingent risk in an environment that continues to be volatile and unpredictable."  He added: "In summary, today's announcement is a significant step forward for CIBC."

34.     CIBC's announcement of the A Note transaction had the intended effect.  That same day, Reuters reported that the contract between CIBC and Promontoria would "help cut [CIBC's] U.S. mortgage exposure" for CIBC which "has been hurt more than its Canadian peers by the subprime mortgage turmoil."

### The A Note

35.     CIBC and Promontoria entered into the A Note, formally titled the A1 Note, on October 16, 2008.  Promontoria initially agreed to loan $1.05 billion to CIBC, but that amount was reduced to $571 million when the A Note was executed in order to account for payments and payoffs of certain underlying assets.  SAF became the holder of the A Note in 2012.

36.     In the A Note, CIBC "promises to pay [SAF] … on each Settlement Date, the Amount Due."  *See* A Note at 6.  Settlement Date is the "25th day of each calendar month" or the following business day.  *See id.*, Annex I at I-4.  Amount Due is defined as the lesser of (1) the outstanding principal balance plus interest and (2) the amount required to be deposited into the Proceeds Account (less various administrative expenses, such as the amounts due to the Paying Agent and Collateral Agent).  *See id.*, Annex I at I-11.

37.     The A Note specifies the amount required to be deposited into the Proceeds Account, providing that each month "CIBC shall deposit into the Proceeds Account" four

specific payment streams.  *See* A Note, Annex I at I-9.   These four payment streams are linked to the performance of Cash Assets and Synthetic Assets in CIBC's residential real estate portfolio that are specifically identified in Exhibit I to the A Note.  The Cash Assets include notes and mortgage-backed securities.  The Synthetic Assets include credit default swaps, such as the Altius IV credit default swaps.  *See id.*, Exhibit I at 1.

38.     The four payment streams that CIBC is contractually obligated to deposit into the Proceeds Account for SAF's benefit are:

- Principal payments related to the Synthetic Assets (defined as Synthetic Asset Principal Proceeds Amount);

- Interest payments related to the Synthetic Assets (defined as Synthetic Asset Interest Proceeds Amount);

- Payments based on the existing Libor rate and the notional amount of the Synthetic Assets (defined as Synthetic Asset Libor Amount);

- Principal and interest payments on the Cash Assets (which, after the initial Settlement Date, are automatically deposited into the Proceeds Account)

*See* A Note, Annex I at I-9.   Each month, CIBC also provides a statement reflecting the payments deposited into the Proceeds Account.

39.     The A Note contains an annual 20% interest rate.  If the funds in the Proceeds Account exceed the monthly interest due to SAF, any remaining funds are used to pay down the principal balance on the A Note.  If the funds in the Proceeds Account are less than the monthly interest due to SAF, the principal balance on the A Note negatively amortizes, or increases by the amount of the interest shortfall.  *See* A Note, Annex I at I-11 through I-12.

40.     SAF's predecessor, Promontoria, took a substantial risk by entering into the A Note transaction.  There was no assurance in October 2008 that the $571 million A Note would be fully repaid, and the yield of the A Note reflected such risk.  The only payments that CIBC is obligated to make under the A Note are the four payment streams set forth above, which

are based on the performance of the Cash Assets and Synthetic Assets identified in the A Note. Given the deepening economic crisis in October 2008, there was significant risk that the performance of those assets would be insufficient to repay the A Note in full.

### Synthetic Libor and Synthetic Interest

41.     CIBC's obligation to pay two of the four payment streams—the Synthetic Asset Libor Amount ("Synthetic Libor") and the Synthetic Asset Interest Proceeds Amount ("Synthetic Interest")—with respect to the three Altius IV credit default swaps is the source of dispute between the parties and the subject of this Complaint.

42.     The A Note sets forth the calculation of Synthetic Libor.  Synthetic Libor is calculated every month by multiplying the existing Libor rate by the Synthetic Asset Notional Amount for each Synthetic Asset.  *See* A Note, Annex I at I-5 through I-7.  This amount is then multiplied by a fraction that represents the length of the month in relation to a full year, in order to reach a monthly amount for Synthetic Libor.  *See id.*, Annex I at I-7.

43.     The Synthetic Asset Notional Amount for the Altius IV credit default swaps is the Relevant Notional Amount calculated in accordance with the Altius IV Swap Confirmations. Specifically, the A Note provides that the Synthetic Asset Notional Amount for each Synthetic Asset is "calculated in accordance with the column entitled 'Individual RONA' in the Synthetic Asset Payment Schedule" attached to the A Note.  *See* A Note, Annex I at I-5 through I-6.  For the Altius IV credit default swaps, the Synthetic Asset Payment Schedule provides that the "Individual RONA" is the "Relevant Notional Amount reduced in accordance with the terms of the Altius IV Swap Documents."  *See* A Note, Exhibit II at II-2.

44.     Similarly, the A Note provides that Synthetic Interest is "calculated in accordance with the column entitled 'Interest Proceeds' in the Synthetic Asset Payment Schedule" attached to the A Note.  *See* A Note, Annex I at I-6.  For the Altius IV credit default swaps, the Synthetic

Asset Payment Schedule provides that Interest Proceeds are the Fixed Payments set forth in the Altius IV Swap Confirmations. *See* A Note, Exhibit II at II-2. As described in paragraph 22, Fixed Payments are the monthly payments that CIBC is owed under the Altius IV Swap Confirmations, and were specified to be 10.5 basis points multiplied by the Relevant Notional Amount of the Altius IV credit default swaps.

45. CIBC and its outside counsel, Mayer Brown LLP, drafted the A Note, including the terms regarding Synthetic Libor and Synthetic Interest, and also drafted the Synthetic Asset Payment Schedule, including its provisions referring to the Altius IV credit default swaps. In correspondence to Cerberus during the contract negotiations in September 2008, CIBC's internal counsel stated that the Synthetic Asset Payment Schedule, which ties the Synthetic Libor payment for the Altius IV credit default swaps to the Relevant Notional Amount under the Swap Confirmations, "clearly outline[s] which cashflows are due from CIBC and how the Reference Portfilio [sic] Notional Amount will adjust for the purposes of the Synthetic Libor Amount calculation."

46. Based on these contract provisions (drafted by CIBC and its counsel and accepted by Promontoria), the calculation of Synthetic Libor and Synthetic Interest for the Altius IV credit default swaps are both based on the Relevant Notional Amount on those swaps. Thus, CIBC is obligated to pay Synthetic Libor and Synthetic Interest to SAF on a monthly basis as long as there is a Relevant Notional Amount on the Altius IV credit default swaps.

### The Relevant Notional Amount on the Altius IV Synthetic Assets

47. The Altius IV Swap Confirmations define the Relevant Notional Amount for each of the three Altius IV credit default swaps. When CIBC and Promontoria entered into the A Note, the Relevant Notional Amount on the Altius IV credit default swaps was approximately $845 million. *See* A Note, Exhibit I at I-1. Thereafter, any principal payments made on the

underlying Altius IV notes would reduce the Relevant Notional Amount—unless there is a Physical Settlement and the Altius IV notes are delivered to CIBC.  *See* Altius IV Swap Confirmations at 2-3.

48.     Upon a Physical Settlement, the Relevant Notional Amount on the Altius IV credit default swaps is frozen and cannot be reduced until November 2042.  The Altius IV Swap Confirmations expressly provide that, "[o]n or after the Delivery Date," when the Altius IV notes are delivered to CIBC pursuant to a Physical Settlement, "the Relevant Notional Amount hereunder shall not be further reduced pursuant to 'Principal Payments'" made on the Altius IV notes.  *See* Altius IV Swap Confirmations at 3.  Instead, the Relevant Notional Amount can only be "reduced by each Scheduled Payment with respect to principal paid."  *See id.*

49.     Scheduled Payment is a defined term in the Altius IV Swap Confirmations.  The only "Scheduled Payment with respect to principal paid" is "the Scheduled Payment Date in November 2042," at which time CIBC is obligated to pay "the total amount of principal due" which is "equal to the Relevant Notional Amount" at the time of Physical Settlement.  *See* Altius IV Swap Confirmations at 9.

50.     Thus, following a Physical Settlement, the Relevant Notional Amount cannot be reduced until November 2042.  As the holder of the Altius IV notes upon a Physical Settlement, CIBC may receive any payments made on the notes, sell the notes, or liquidate the assets underlying the notes (subject to SAF's control rights under the A Note).  Regardless, following a Physical Settlement, the Relevant Notional Amount of the Altius IV credit default swaps cannot be reduced until November 2042.  *See* Altius IV Swap Confirmations at 3, 9-10.

### *Altius IV Credit Event and Physical Settlement*

51.     On May 11, 2010, the Trustee of the Altius IV notes sent a notice of event of default to Altius IV, Goldman, Sachs & Co. and others.  The notice stated that there was a

default in the payment of interest on all three tranches of the Altius IV notes covered by the Altius IV Swap Confirmations in April 2010.  Those tranches are the A1B tranche, the A1F tranche and the A1V tranche of Altius IV notes.

52.    On May 28, 2010, Goldman Sachs sent a Credit Event Notice to CIBC regarding the A1B tranche of Altius IV notes, and Goldman Sachs provided CIBC with a Notice of Physical Settlement for those Altius IV A1B notes, stating that it would deliver those notes to CIBC in accordance with the terms of the Altius IV Swap Confirmation corresponding to the A1B notes.

53.    On June 7, 2010, Goldman Sachs sent a Credit Event Notice to CIBC regarding the A1F tranche of the Altius IV notes, and Goldman Sachs provided CIBC with a Notice of Physical Settlement for those Altius IV A1F notes, stating that it would deliver those notes to CIBC in accordance with the terms of the Altius IV Swap Confirmation corresponding to the A1F notes.

54.    Upon information and belief, in or around June 2010, Goldman Sachs and CIBC completed a Physical Settlement of all three tranches of the Altius IV notes, and Goldman Sachs delivered all three tranches of the Altius IV notes to CIBC in accordance with the terms of the Altius IV Swap Confirmations.

55.    At the time of the Physical Settlement, the Altius IV credit default swaps had a Relevant Notional Amount of approximately $830 million.  After the Physical Settlement, in accordance with the unambiguous terms of the Altius IV Swap Confirmations, the Relevant Notional Amount was frozen at approximately $830 million and could be reduced only by the Scheduled Payment in November 2042, and not by any principal payments on the Altius IV notes in the interim.  *See* Altius IV Swap Confirmations at 3, 9-10.  Thus, from the time that the Altius IV notes were delivered to CIBC in 2010 until the Scheduled Payment in November 2042,

Synthetic Libor and Synthetic Interest for the Altius IV credit default swaps were required, by the terms of the A Note, to be based on a Relevant Notional Amount of approximately $830 million.

56.     Following the Physical Settlement in 2010, CIBC's monthly payments, and its monthly statements, continued to include Synthetic Libor and Synthetic Interest on account of the Altius IV credit default swaps, through July 2015.  These monthly statements also reflected a Relevant Notional Amount for the Altius IV credit default swaps.  However, CIBC continued to reduce the Relevant Notional Amount for the Altius IV credit default swaps on account of principal payments made on the Altius IV notes, resulting in a failure to pay the full amount of Synthetic Libor and Synthetic Interest owed to SAF in breach of the A Note.

### The B Note

57.     The A Note originally included an optional redemption provision.  Pursuant to that provision, CIBC was entitled to call the A Note beginning in October 2011, three years after the parties entered into the A Note.  If it called the A Note, CIBC would have been obligated to pay the remaining principal on the A Note, any accrued and unpaid interest, and a contractually specified redemption premium.  The amount of the redemption premium—or call premium— depended on the outstanding principal balance of the A Note, with a larger principal balance resulting in a larger call premium.  CIBC decided not to exercise the optional redemption provision in the A Note, which would have relieved CIBC of all obligations to SAF.

58.     Instead, in March 2011, CIBC approached Cerberus about the possibility of entering into a follow-on transaction to the A Note.  Thereafter, CIBC and Cerberus discussed and negotiated a transaction in which Cerberus or an affiliate would purchase a certificate that would entitle it to the residual interests in the same payment streams specified in the A Note.

The residual interests would be any value remaining in those payment streams if the A Note is paid off.

59.     On June 20, 2011, CIBC and SAF entered into the B Note transaction.  SAF paid CIBC $80 million, a price set by CIBC, to acquire the B Note.  As with the A Note transaction, CIBC and its counsel drafted the principal transaction documents, including the contract between the parties, annexes and exhibits to the contract and related transaction documents.

60.     The B Note contains the identical payment structure as the A Note.  In the B Note, CIBC "promises to pay [SAF], on each Settlement Date … the Residual Amount."  *See* B Note at 6.  As with the A Note, the B Note defines Settlement Date as the "25th day of each calendar month" or the following business day.  *See id.*, Annex I at I-5.  Residual Amount is the amount required to be deposited into the Proceeds Account (less various administrative expenses, such as the amounts due to the Paying Agent and Collateral Agent).  *See id.*, Annex I at I-11.  Like the A Note, the B Note specifies the amount required to be deposited into the Proceeds Account. The B Note's provision with respect to the required deposit amount is virtually identical to the A Note, stating that each month "CIBC shall deposit into the Proceeds Account" the same four specific payment streams.  *See id.*, Annex I at I-10.

61.     The B Note contains the identical four payment streams as the A Note, including Synthetic Libor and Synthetic Interest.  *See* B Note, Annex I at I-10.  Synthetic Libor and Synthetic Interest for the Altius IV credit default swaps are calculated in the exact same manner under the B Note as they are calculated under the A Note.  *See id.*, Annex I at I-7 through I-10 and Exhibit II at 3.  Under the B Note, Synthetic Libor and Synthetic Interest on the Altius IV credit default swaps are calculated based on the Relevant Notional Amount of the Altius IV credit default swaps, just like under the A Note.  *See id.*  Like the A Note, CIBC is obligated

under the B Note to pay Synthetic Libor and Synthetic Interest to SAF on a monthly basis as long as there is a Relevant Notional Amount on the Altius IV credit default swaps. *See id.*

62.     At the time that CIBC and SAF entered into the B Note in June 2011, the A Note had an outstanding principal balance of more than $540 million.  In entering into the B Note transaction, SAF took the risk that the A Note would never pay off.  If that occurred, CIBC would not be obligated to make any payments under the B Note.  *See* B Note, Annex I at I-13.  If the A Note did pay off, however, the B Note obligates CIBC to make the same monthly payments to SAF as the payments specified in the A Note, for as long as those payment streams had value.  In entering into the B Note, CIBC took the risk that the A Note would pay off and that the residual interests in these monthly payment streams would have substantial value.

63.     As with the A Note, nothing in the B Note relieves CIBC of its obligation to pay Synthetic Libor or Synthetic Interest as long as the Altius IV credit default swaps continue to have a Relevant Notional Amount.  As with the A Note, there is nothing in the B Note that permits CIBC to reduce the Relevant Notional Amount on the Altius IV credit default swaps to $0 if the Altius IV notes are sold or the underlying assets are liquidated, particularly where the proceeds of such a sale or liquidation are far less than the Relevant Notional Amount.

### *CIBC's Breaches of the A Note and the B Note*

64.     By late 2014, the portfolio of real estate assets underlying the Altius IV notes had a market value that warranted liquidation of those assets.  By that time, SAF had raised with CIBC its obligation to pay Synthetic Libor and Synthetic Interest on the Altius IV credit default swaps until November 2042, even if the portfolio of assets underlying the Altius IV notes was liquidated.  Over the course of multiple discussions spanning several months, CIBC made clear that it had no intention of honoring its contractual obligation to continue paying Synthetic Libor and Synthetic Interest until 2042.  In the spring of 2015, SAF exercised the control rights granted

to it under the A Note and directed CIBC to pursue a liquidation of the assets underlying the Altius IV notes. That portfolio of assets was ultimately liquidated in July 2015.

65.     After the portfolio of assets underlying the Altius IV notes was liquidated, CIBC improperly reduced the Relevant Notional Amount on the Altius IV credit default swaps to $0 in July 2015. The terms of the Altius IV Swap Confirmations provide that, following the Physical Settlement in 2010, the Relevant Notional Amount is frozen and "shall not be further reduced pursuant to 'Principal Payments'" until November 2042. *See* Altius IV Swap Confirmations at 3. Thus, the Relevant Notional Amount of the Altius IV credit default swaps is approximately $830 million. CIBC's elimination of the Relevant Notional Amount on the Altius IV credit default swaps was improper and resulted in a shortfall in the Synthetic Libor and Synthetic Interest paid to SAF beginning in July 2015, in breach of the A Note and the B Note.

66.     Even if it were appropriate to reduce the Relevant Notional Amount following the liquidation of the assets underlying the Altius IV notes in July 2015, there is no contractual basis for reducing it to $0. Assuming there was no Physical Settlement in 2010, the Relevant Notional Amount on the Altius IV credit default swaps was approximately $700 million at the time of the liquidation of the assets underlying the Altius IV notes in July 2015. The liquidation yielded approximately $191 million in proceeds. Thus, even if the liquidation proceeds arguably could reduce the Relevant Notional Amount on the Altius IV credit default swaps—and they cannot— the Relevant Notional Amount still would be at least $509 million.

67.     Because CIBC improperly reduced the Relevant Notional Amount for the Altius IV credit default swaps to $0 in July 2015, there was a shortfall in its monthly payment to SAF on July 25, 2015. In particular, CIBC failed to pay the full amount of Synthetic Libor owed to SAF on account of the Altius IV credit default swaps. By failing to pay the full amount of Synthetic Libor, CIBC failed to pay the full Amount Due. This was a breach of CIBC's

"promise[]" in the A Note "to pay to [SAF] … on each Settlement Date, the Amount Due."  *See* A Note at 6.

68.     CIBC's breach continued for three business days, and therefore became an Event of Default under the terms of the A Note.  *See* A Note, Annex I at ¶ 3.  Pursuant to its rights under the A Note, SAF accelerated the A Note and sent notice to CIBC on July 31, 2015.  *See* July 31, 2015 Letter from SAF to CIBC (attached as Exhibit D).  In that notice, SAF set the Final Maturity Date for the A Note as August 7, 2015.  *See id.*

69.     As a result of this acceleration, the outstanding principal balance of the A Note plus accrued and unpaid interest was due and payable on August 7, 2015.  The outstanding principal balance on the A Note at that time was $8,410,952.36.  CIBC failed to pay that amount, plus interest, in further breach of its "promise[]" in the A Note "to pay to [SAF], on the Final Maturity Date … the Amount Due."  *See* A Note at 6.

70.     The next monthly payment on August 25, 2015 was due on the B Note.  The B Note provides that on "each Settlement Date occurring on or after the Senior Note Repayment Date, CIBC shall deposit into the Proceeds Account" each of the four payment streams set forth above.  *See* B Note, Annex I at I-10.  The Senior Note Repayment Date is the "date upon which the outstanding principal amount of the Class A1 Note shall have been prepaid or repaid in full, together with interest thereon."  *See id.*, Annex I at I-5.  The A Note should have been repaid in full on August 7, 2015, the Final Maturity Date of the A Note.  As a result, the August 25, 2015 payment was owed on the B Note.

71.     In its August 25, 2015 payment to SAF, CIBC continued to reflect the Relevant Notional Amount on the Altius IV credit default swaps as $0.  As a result, CIBC again failed to pay the full amount of Synthetic Libor and Synthetic Interest due on account of the Altius IV credit default swaps.  By failing to pay the full amount of Synthetic Libor and Synthetic Interest,

CIBC failed to pay the full Residual Amount owed to SAF.  This was a breach of CIBC's "promise[]" in the B Note "to pay to [SAF] … the Residual Amount" "on each Settlement Date failing on or after the Senior Note Repayment Date."  *See* B Note at 6.

72.     CIBC's breach continued for three business days, and therefore became an Event of Default under the terms of the B Note.  *See* B Note, Annex I at ¶ 3.  Pursuant to its rights under the B Note, SAF terminated the B Note and sent notice to CIBC on September 1, 2015. *See* Sept. 1, 2015 Letter from SAF to CIBC (attached as Exhibit E).  In that termination notice, SAF set the Early Termination Date for the B Note as September 8, 2015.  *See id.*

73.     In the B Note, CIBC "promises to pay to [SAF] … on the Early Termination Date (if any), the Early Termination Amount."  *See* B Note at 6.  The Early Termination Amount includes the present value of all four payment streams due on the Cash Assets and Synthetic Assets, including Synthetic Libor (which depends on the floating Libor rate) and Synthetic Interest on the Altius IV credit default swaps.  *See id.*, Annex I at I-1 through 1-2.  CIBC failed to pay the Early Termination Amount due to SAF on the Early Termination Date, in breach of the B Note.  *See* B Note at 6.

74.     As of the date of this Complaint, CIBC continues to refuse to pay the hundreds of millions of dollars due to SAF under the unambiguous terms of the A Note and the B Note.  And CIBC has further made clear that it will not pay any Synthetic Libor or Synthetic Interest on the Altius IV credit default swaps in the future.

### *CIBC's Failure to Freeze the Relevant Notional Amount*

75.     As set forth above, under the terms of the Altius IV Swap Confirmations, the Relevant Notional Amount for the Altius IV credit default swaps was frozen on the date of the Physical Settlement in 2010.  In calculating the monthly payments that were owed to SAF between 2010 and July 2015, CIBC failed to freeze the Relevant Notional Amount on the Altius

IV Credit Default Swaps.  Despite the clear language of the Altius IV Swap Confirmations, CIBC reduced the Relevant Notional Amount for the Altius IV credit default swaps by principal payments that CIBC received on account of holding the Altius IV notes.

76.     As a result of CIBC's improper reduction of the Relevant Notional Amount for the Altius IV credit default swaps, CIBC underpaid Synthetic Libor and Synthetic Interest due on account of the Altius IV credit default swaps in each monthly payment after the Physical Settlement in 2010.  This is a further breach of the A Note.  *See* A Note at 6.

## COUNT I—BREACH OF CONTRACT
### Breach Of The A Note

77.     SAF incorporates all preceding paragraphs of its Complaint as if fully set forth herein.

78.     SAF and CIBC are parties to a contract known as the A Note.

79.     SAF has adequately and fully performed all of its obligations under the A Note. Specifically, SAF's predecessor in interest, Promontoria, provided a $571 million loan to CIBC in exchange for the A Note.

80.     CIBC failed to fully perform and breached the A Note.  Specifically, CIBC failed to pay the full Amount Due on the A Note in the monthly payment due on July 25, 2015.  In the A Note, CIBC "promises to pay to [SAF] … on each Settlement Date, the Amount Due."  *See* A Note at 6.  As a result of CIBC's improper reduction of the Relevant Notional Amount on the Altius IV credit default swaps to $0 in July 2015, CIBC failed to pay the full amount of Synthetic Libor owed to SAF in the monthly payment due on July 25, 2015.  By failing to pay the full amount of Synthetic Libor, CIBC failed to pay the full Amount Due.  CIBC's failure to pay SAF the full Amount Due on the A Note on July 25, 2015 constitutes a breach of the A Note.

81.     In further breach of the A Note, CIBC failed to pay the outstanding principal balance on the A Note, plus interest, on the Final Maturity Date of the A Note.  CIBC's failure to

pay the full Amount Due to SAF on July 25, 2015 became an Event of Default under the A Note after three business days.  *See* A Note, Annex I at ¶ 3.  SAF accelerated the A Note and set the Final Maturity Date as August 7, 2015.  *See* July 31, 2015 Letter from SAF to CIBC.  On the Final Maturity Date, the full amount of the outstanding principal, $8,410,952.36, plus interest was due to SAF.  CIBC did not pay the amount owed to SAF on the Final Maturity Date, in breach of its "promise[] to pay to [SAF], on the Final Maturity Date … the Amount Due."  *See* A Note at 6.

82.    CIBC's breaches of the A Note have damaged SAF in an amount to be proven at trial.  SAF's damages include, but are not limited to, the full amount of principal and interest due on the A Note as of the Final Maturity Date of August 7, 2015.

**COUNT II—BREACH OF CONTRACT**
**Breach Of The A Note**

83.    SAF incorporates all preceding paragraphs of its Complaint as if fully set forth herein.

84.    SAF and CIBC are parties to a contract known as the A Note.

85.    SAF has adequately and fully performed all of its obligations under the A Note. Specifically, SAF's predecessor in interest, Promontoria, provided a $571 million loan to CIBC in exchange for the A Note.

86.    CIBC failed to fully perform and breached the A Note.  Specifically, CIBC failed to pay the full Amount Due on the A Note in each monthly payment after the Physical Settlement in 2010.  In the A Note, CIBC "promises to pay to [SAF] … on each Settlement Date, the Amount Due."  *See* A Note at 6.  CIBC improperly reduced the Relevant Notional Amount on the Altius IV credit default swaps following the Physical Settlement in 2010.  As a result, CIBC failed to pay the full amount of Synthetic Libor and Synthetic Interest owed to SAF in each monthly payment due after the Physical Settlement in 2010.  By failing to pay the full

amount of Synthetic Libor and Synthetic Interest, CIBC failed to pay the full Amount Due in each monthly payment after the Physical Settlement in 2010. CIBC's failure to pay SAF the full Amount Due on the A Note in each monthly payment after the Physical Settlement in 2010 constitutes a breach of the A Note. *See* A Note at 6.

87. CIBC's breaches of the A Note have damaged SAF in an amount to be proven at trial.

## COUNT III—BREACH OF CONTRACT
### Breach Of The B Note

88. SAF incorporates all preceding paragraphs of its Complaint as if fully set forth herein.

89. SAF and CIBC are parties to a contract known as the B Note.

90. SAF has adequately and fully performed all of its obligations under the B Note. Specifically, SAF paid $80 million to CIBC in exchange for the B Note.

91. CIBC failed to fully perform and breached the B Note. Specifically, CIBC's breaches of the A Note constitute Events of Default under the A Note, as set forth above. Those Events of Default have continued, in breach of the B Note. *See* B Note, Annex I at ¶ 3(e) (stating that "the occurrence and continuance of an Event of Default under the Class A1 Note" shall constitute an Event of Default under the B Note).

92. In further breach of the B Note, CIBC failed to pay the full Residual Amount in the monthly payment due on the B Note on August 25, 2015. In that monthly payment, CIBC failed to pay the full amount of Synthetic Libor and Synthetic Interest owed to SAF on account of the Altius IV credit default swaps. By failing to pay the full amount of Synthetic Libor and Synthetic Interest, CIBC failed to pay the full Residual Amount owed to SAF. This was a breach of CIBC's "promise[]" in the B Note "to pay to [SAF] … the Residual Amount" "on each Settlement Date failing on or after the Senior Note Repayment Date." *See* B Note at 6.

93.     In further breach of the B Note, CIBC failed to pay the Early Termination Amount on the Early Termination Date.  CIBC's failure to pay the full Residual Amount in the monthly payment due on the B Note on August 25, 2015 became an Event of Default under the B Note after three business days.  *See* B Note, Annex I at ¶ 3.  SAF terminated the B Note and set the Early Termination Date of the B Note as September 8, 2015.  *See* Sept. 1, 2015 Letter from SAF to CIBC.  On the Early Termination Date, CIBC was obligated to pay the Early Termination Amount.  *See* B Note at 6.  CIBC failed to pay this amount, in breach of its "promise[] to pay to [SAF] … on the Early Termination Date (if any), the Early Termination Amount." *See id.*

94.     As a result of CIBC's breaches of the B Note, SAF has suffered hundreds of millions of dollars of damage.  SAF's damages include, but are not limited to, the Early Termination Amount due on the B Note.  The specific amount of SAF's damages will be proven at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff SAF respectfully requests the Court:

1.     Find that CIBC breached the A Note by failing to pay the full Amount Due in the monthly payment due on July 25, 2015;

2.     Find that CIBC breached the A Note by failing to pay the outstanding principal and interest due to SAF on the Final Maturity Date of August 7, 2015;

3.     Find that CIBC breached the A Note by failing to pay the full Amount Due in the monthly payments between the Physical Settlement in 2010 and the monthly payment due on July 25, 2015;

4.     Find that CIBC breached the B Note by failing to pay the full Residual Amount due to SAF in the monthly payment due on August 25, 2015;

5.      Find that CIBC breached the B Note by failing to pay the Early Termination

Amount due to SAF on the Early Termination Date of September 8, 2015;

6.      Award SAF at least $8,410,952.36, plus interest, in damages as a result of CIBC's

breaches of the A Note;

7.      Award SAF damages of at least hundreds of millions of dollars as a result of

CIBC's breaches of the B Note;

8.      Award SAF all expenses for this action, including costs and fees; and

9.      Award such other and further relief as the Court may deem just and proper.

Dated:  October 30, 2015                    _s/ Joseph Serino Jr., P.C._
                                            Joseph Serino Jr., P.C.
                                            KIRKLAND & ELLIS LLP
                                            601 Lexington Avenue
                                            New York, NY 10022
                                            Tel: (212) 446-4800
                                            Fax: (212) 446-4900

                                            Jeffrey S. Powell (*pro hac* forthcoming)
                                            Daniel T. Donovan (*pro hac* forthcoming)
                                            Judson D. Brown (*pro hac* forthcoming)
                                            KIRKLAND & ELLIS LLP
                                            655 Fifteenth St., N.W.
                                            Washington, DC 20005
                                            Tel: (202) 879-5000
                                            Fax: (202) 879-5200

                                            *Attorneys for Plaintiff Securitized Asset Funding
                                            2011-2, Ltd.*